## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

EDWARD MARTINEZ, Individually and on
Behalf of All Others Similarly Situated and
Derivatively on behalf of The Finish Line, Inc.,

        Plaintiff,

      vs.

GLENN S. LYON, TORRENCE BOONE,
WILLIAM P. CARMICHAEL, RICHARD P.
CRYSTAL, FAISAL MASUD, STEPHEN
GOLDSMITH, CATHERINE A. LANGHAM,
and SAMUEL M. SATO,

        Defendants,

THE FINISH LINE, INC.,

        Nominal Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**Civil Action No. 1:18-cv-1342**

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE
ACT OF 1934 AND
DERIVATIVELY FOR BREACH
OF FIDUCIARY DUTIES**

**JURY TRIAL DEMAND**

Plaintiff Edward Martinez ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

### SUMMARY OF THE ACTION

1.    Plaintiff brings this stockholder class action on behalf of itself and all other public stockholders of The Finish Line, Inc. ("Finish Line" or the "Company"), against Finish Line, and the Company's Board of Directors (the "Board" or the "Individual Defendants," collectively with Finish Line, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and derivatively on behalf of Finish Line itself for breaches of fiduciary duty as a result of Defendants' efforts to sell the Company to JD Sports

Fashion PLC ("Parent") and Genesis Merger Sub, Inc. ("Merger Sub," collectively with Parent "JD Sports") as a result of an unfair process for an unfair price, and to enjoin an upcoming stockholder vote in which JD Sports will acquire each outstanding share of Finish Line common stock for $13.50 per share, with a total valuation of approximately $558 million (the "Proposed Transaction").

2.       The terms of the Proposed Transaction were memorialized in a March 26, 2018 filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").

3.       Thereafter, on April 24, 2018, Finish Line filed a Preliminary Proxy Statement on Form Pre14A (the "Preliminary Proxy") with the Securities and Exchange Commission (the "SEC") in support of the Proposed Transaction.

4.       The Proposed Transaction is unfair and undervalued for a number of reasons. Significantly, as noted in the Preliminary Proxy, the sales process was hastily conducted without a proper market check, in order to avoid an escalation of a conflict with an activist investor.  This overly accelerated process resulted in a process where only one other party was ever considered as a potential strategic partner, namely, JD Sports.

5.       Next, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits while the Company's stockholders are cashed out at an unfair price.  For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange large, illiquid blocks of Company stock for massive payouts, in addition to receiving cash in exchange for all outstanding and unvested options and/or other types of restricted stock units.  Moreover, certain Directors and other

insiders will also be the recipients of lucrative change-in-control agreements, triggered upon the termination of their employment as a consequence of the consummation of the Proposed Transaction.  Such large paydays upon the consummation of the Proposed Transaction, have clearly tainted the motivations of the Board in approving it.

6.      Defendants breached their fiduciary duties to the Company's stockholders by agreeing to the Proposed Transaction which undervalues Finish Line and is the result of a flawed sales process.  Moreover, Finish Line stockholders will see their investment of any and all future profitability of Finish Line expunged, as they are cashed out of their ownership interest in the Company.

7.      Finally, in violation of sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and their fiduciary duties, Defendants caused to be filed the materially deficient Preliminary Proxy on April 24, 2018 with the SEC in an effort to solicit stockholders to vote their Finish Line shares in favor of the Proposed Transaction.  The Preliminary Proxy is materially deficient and deprives Finish Line stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Transaction.  As detailed below, the Preliminary Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process leading up to the Proposed Transaction; (b) the Company's financial projections; (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor, PJ SOLOMON ("PJ SOLOMON"); and (d) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Special Committee of the Company Board's financial advisor, Houlihan Lokey Capital, Inc. ("Houlihan Lokey").

8.     Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from violation of the federal securities laws by Defendants.

## PARTIES

9.     Plaintiff is a citizen of the State of New Jersey and, at all times relevant hereto, has been a Finish Line stockholder.

10.     Defendant Finish Line operates as a retailer of athletic shoes, apparel, and accessories for men, women, and kids in the United States.  Finish Line is an Indiana corporation with its principal executive offices located at 3308 N. Mitthoeffer Rd., Indianapolis, Indiana 46235.

11.     Defendant Glenn S. Lyon ("Lyon") has been a Director of the Company at all relevant times.  In addition, Lyon serves as the Chairman of the Company Board, and previously served as the Company's Chief Executive Officer ("CEO").

12.     Defendant Torrence Boone ("Boone") has been a director of the Company at all relevant times.  In addition, Boone serves as a member on the Board's Governance & Nominating Committee.

13.     Defendant William P. Carmichael ("Carmichael") has been a director of the Company at all relevant times.  In addition, Carmichael serves as the Chair of the Board's Audit Committee and is designated by the Company as a "Financial Expert" and as the "Lead Director."

14.     Defendant Scott McNeill ("McNeill") has been a director of the Company at all relevant times.  In addition, McNeill has served as the Company's Chief Financial Officer ("CFO") since its inception.

15.     Defendant Richard P. Crystal ("Crystal") has been a director of the Company at all relevant times.   In addition, Crystal serves as a member on the Board's Compensation Committee.

16.     Defendant Faisal Masud ("Masud") has been a director of the Company at all relevant times.  In addition, Masud serves as a member on the Board's Compensation Committee.

17.     Defendant Stephen Goldsmith ("Goldsmith") has been a director of the Company at all relevant times.  In addition, Goldsmith serves as the Chair of the Board's Governance & Nominating Committee and as a member on the Board's Audit Committee.

18.     Defendant Catherine A. Langham ("Langham") has been a director of the Company at all relevant times.   In addition, Langham serves as the Chair of the Board's Compensation Committee and as a member on the Board's Audit Committee.

19.     Defendant Samuel M. Sato ("Sato") has been a director of the Company at all relevant times.  In addition, Sato currently serves as the Company's CEO and has previously served as the Company's President, Chief Merchandising Officer, and as President of the Finish Line Brand.

20.     Defendants Lyon, Boone, Carmichael, Crystal, Masud, Goldsmith, Langham, and Sato, identified in ¶¶ 11 - 19 are collectively referred to as the "Individual Defendants."

21.     Non-Party Parent is engaged in the retail of branded sports fashionwear, and outdoor clothing and equipment.  Parent is an English PLC, with its principal place of business located at Hollinsbrook Way, Pilsworth, Bury, Lancashire, United Kingdom.

22.     Non-Party Merger Sub is an Indiana corporation and a wholly owned subsidiary of Parent, created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

24.     Personal jurisdiction exists over each defendant either because the defendant conducts business in, is incorporated in, or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Finish Line has its principal place of business in this District, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Finish Line common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

27.     This action is properly maintainable as a class action because:

      a.     The Class is so numerous that joinder of all members is impracticable.  As of December 8, 2017, there were more than 40 million common shares of Finish

Line stock outstanding. The actual number of public stockholders of Finish Line will be ascertained through discovery;

b. There are questions of law and fact which are common to the Class, including *inter alia*, the following:

    i. Whether Defendants have violated the federal securities laws;

    ii. Whether Defendants made material misrepresentations and/or omitted material facts in the Preliminary Proxy; and

    iii. Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Transaction is consummated.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f. Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES**

28.    By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Finish Line and owe the Company the duties of due care, loyalty, and good faith.

29.    By virtue of their positions as directors and/or officers of Finish Line, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Finish Line to engage in the practices complained of herein.

30.    Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

a.  act with the requisite diligence and due care that is reasonable under the circumstances;

b.  act in the best interest of the company;

c.  use reasonable means to obtain material information relating to a given action or decision;

d.  refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

e.  avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

      f.   disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

31.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Finish Line, are obligated to refrain from:

      a.   participating in any transaction where the directors' or officers' loyalties are divided;

      b.   participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

      c.   unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

32.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Finish Line, Plaintiff and the other public stockholders of Finish Line, including their duties of loyalty, good faith, and due care.

33.    As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Finish Line common stock in the Proposed Transaction.

## DEMAND FUTILITY

34.     Plaintiff also brings this action derivatively in the right of and for the benefit of Finish Line to redress injuries suffered and to be suffered by Finish Line as a direct result of the violations of law and breaches of fiduciary duty by the Director Defendants.

35.     Plaintiff will adequately and fairly represent the interests of Finish Line and its shareholders in enforcing and prosecuting their rights.  Plaintiff owns Finish Line common stock and owned Finish Line common stock at all times relevant to the Defendants' wrongful course of conduct alleged herein.

36.     It is well settled law that demand is excused when the stockholder alleges that such a demand would be futile.  Specifically, Indiana law holds that,

> Normally, under Indiana Code § 23-1-32-2, a shareholder wishing to file a derivative lawsuit to pursue a corporation's rights must first demand that the board of directors take action.  Since the late 19th century, Indiana has consistently recognized an excuse from the demand requirement where the shareholder alleges with particularity in a verified complaint that a majority of the board of directors are either the tortfeasors and/or interested in the transaction at issue.

*Ritter v. Dollens (In re Guidant S'holders Derivative Litig*.), 841 N.E.2d 571, 572 (Ind. 2006) (citations omitted).

37.     Demand on the Board is excused because Finish Line would suffer irreparable harm if demand were required to be made on the Board.  The delay ensuing from a requirement that demand be made would allow the Individual Defendants to effectuate the Proposed Transaction to the irreparable harm of the Company. According to the Company's press release, Defendants expect to complete the Proposed Transaction as early as a month from now - June 2018.  Once the

Proposed Transaction is effectuated, there is no feasible way to "unscramble the eggs" and no way for Finish Line to recover any losses. Demand is excused because irreparable harm would be caused to the Company due to a demand or delay in the Company's response to a demand.

38.    Any suit by the directors of Finish Line to remedy these wrongs would likely expose the Individual Defendants and Finish Line to further civil actions being filed against one or more of the Individual Defendants; therefore, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

39.    In order to bring this action for breaching their fiduciary duties and engaging in other misconduct, the members of the Finish Line Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Corporation, who are their good friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do. Therefore, the Director Defendants would not be able to vigorously prosecute any such action.

40.    The members of the Finish Line Board of Directors receive benefits, stock options and other emoluments by virtue of their membership on the Board and their control of Finish Line. For example, non-employee directors receive an annual retainer of $40,000.00 per year plus an additional $10,000.00 per year for each committee on which they serve and $500.00 for each committee meeting they participate in. Beginning in 2004, the Audit Committee members started receiving $1,000.00 for each audit meeting the participated in. In addition, the Company reimburses its directors for expenses, including travel, they incur in connection with attending board and committee meetings. Moreover, non-employee directors receive an annual grant of 3,000 shares of restricted common stock under the Finish Line Corporation Restricted Stock Plan for Non-Employee Directors. They have thus benefited from the wrongdoing herein alleged and

have engaged in such conduct to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

41.     Pursuant to the Company's Corporate Governance Guidelines, the primary responsibility of the Board is to "oversee the business and affairs of the Company for the protection and enhancement of shareholder value."  Despite their knowledge of the facts alleged herein, the Defendants intentionally and/or recklessly allowed the Company to disseminate false and misleading information to the investing public without reasonably assuring themselves that the Company would comply with required procedures and otherwise comply with its legal requirements.

42.     The Defendants undertook this course of conduct with intentional and/or reckless breach of their fiduciary duties because they were afraid that taking the drastic action that was necessary to correct and address the severe lack of any internal controls would: (a) harm the market price of Finish Line's stock; (b) result in the loss of goodwill in the investing community; and c) jeopardize their personal reputations and financial interests.

43.     Plaintiff has not made any demand on Finish Line to institute an action against the Defendants for their breach of fiduciary duties and other misconduct since such demand would be a futile and useless act for, *inter alia*, the following reasons:

      a.  A majority of the Finish Line Board of Directors participated in, approved or recklessly disregarded the wrongs complained of herein, which could not have been an exercise of good faith business judgment.

      b.  Finish Line's Board has engaged in a systematic course of conduct pursuant to which they have continually favored the interests of Finish Line insiders, at the

direct expense of the Company and its stockholders, which could not have been an exercise of good faith business judgment.

c.   The acts which are complained of herein constitute violations of fiduciary duties owed to the Company and its shareholders and violations of law and these acts are incapable of ratification.

d.   In order to bring this suit, the Director Defendants would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do.   These inter-related business and personal relationships have developed debilitating conflicts of interest which prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.

e.   Several of Finish Line's Board members own substantial amounts of the Company stock and have personally profited from these wrongful acts.

f.   To bring an action against themselves would subject the Defendants to personal liability in the securities class action lawsuits pending, as well as additional liability  in future lawsuits that could result from such an action.

g.   Finish Line's officers and directors are protected against personal liability by a directors' and officers' liability insurance policy.  They caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders of Finish Line.  However, the directors' and officers' liability insurance policies covering Defendants contain provisions which eliminate coverage for any action brought directly by Finish Line against these Defendants, known as, inter alia, the "insured-versus-insured exclusion."

As a result, if these directors were to sue themselves, no insurance protection would be provided for the derivative claims. Thus, this is a further reason why the Finish Line Board will not bring such a suit, for to do so would subject themselves and their colleagues and/or friends to a judgment of millions of dollars that would have to be paid from their individual assets alone. On the other hand, if the claims are brought derivatively, such insurance coverage will provide a basis for the Company to effectuate a recovery.

h. According to the Company's SEC June 2, 2017 Proxy, Defendants acknowledge that Defendants Lyon and Sato, the Company Chairman and CEO, respectively, are not independent and therefore, demand is futile as to these defendants. Lyon and Sato are not independent because of their current tor past employment as senior executives of the Company.

44. In addition to the above stated facts, demand is futile because the Compensation Committee of the Board determines salaries and other compensation, and consists Defendants Crystal, Langham, and Masud. As such Demand on all other Defendants would be futile as they would not bring an action against these Defendants who decide their own compensation

## SUBSTANTIVE ALLEGATIONS

*Company Background*

45. Finish Line operates as a retailer of athletic shoes, apparel, and accessories for men, women, and kids in the United States. The company offers athletic shoes, as well as an assortment of apparel and accessories of Nike, Brand Jordan, adidas, Under Armour, Puma, and other brands. It engages in the in-store and online retail of athletic shoes for Macy's Retail Holdings, Inc.; Macy's Puerto Rico, Inc.; and Macys.com, Inc., as well as online at macys.com. The Company currently

has over 900 retail locations spread throughout 47 states in the United States and Puerto Rico. It also operates e-commerce site, finishline.com and mobile commerce site, m.finishline.com.

46.    Finish Line's most recent financial results, reported on the same day as the announcement of the Proposed Transaction, indicated sustained and solid financial performance. For example, in the March 26, 2018, press release announcing its 2017 Q4 and FY financial results, the Company noted such highlights as an increase in net sales driven by an 8.5% increase in Finish Line's Macy's sales.

47.    Speaking on these positive results, CEO of Finish Line Defendant Sato stated that the Company's actions in Q4 2018 will "will deliver profitability at or above the high-end of our guidance range."

48.    The Company's recent success is indicative of a trend, with previous quarters also showcasing such positive financial results. For example, in a December 21, 2017 press release announcing Q3 financial results for the 2018 year, the Company noted such financial highlights as a 1.8% increase in net sales.

49.    Speaking on these results, Defendant Sato stated, "We finished the third quarter ahead of expectations," and continued, commenting on likely future success for the Company by stating, "The growth initiatives that we've put in place are driving increased traffic to our brand and helping increase conversion."

50.    Despite this upward trajectory and continually increasing financial results, the Individual Defendants have caused Finish Line to enter into the Proposed Transaction, thereby extinguishing Plaintiff's and other Finish Line's public stockholders' interest in the Company and foreclosing their opportunity to reap the benefits of Finish Line's present and future success.

*The Flawed Sales Process*

51.     The process deployed by the Individual Defendants was flawed and inadequate, and conducted out of the self-interest of the Individual Defendants, and seems to have been designed solely to effectuate a quick transaction for JD Sports' benefit.  Of particular note, the Company failed to conduct a proper market check for other interested third parties.

52.     The reasoning for this quick and ill-fleshed out sales process seems to be the continuing issues the Company had with an activist investor, Sports Direct International PLC ("Sports Direct").  Beginning in April 2017 and continuing throughout the sales process, Sports Direct filed several Schedule 13Ds with the SEC reporting an increasing ownership interest in the Company, both direct and through affiliates, of Finish Line common shares as well as common share short term put options, which at its high point aggregate, represented an approximate 30% interest in Finish Line.

53.     Simultaneously, Sports Direct continuously made overtures towards Defendant Sato and Company management seeking collaborations in several business opportunities both in the US and internationally.

54.     In response to these aggressive overtures, the Company effectuated a stockholder rights plan on August 28, 2017.

55.     Thereafter, disputes arose between Sports Direct and the Company centered around the stockholder rights plan's effect on the short put options that it had purchased, and threatened legal action in the state courts of Indiana to resolve the matter in its favor.

56.     Thereafter the Preliminary Proxy indicates that the Board caused the Company to enter into discussions with JD Sports regarding a potential strategic alternative, deliberately foregoing any form of market check.

57.    Clearly such a focus on only one possible purchaser belies the real reason for the Proposed Transaction – that the Board was desperate to get out of any situation wherein they were forced to deal with Sports Direct and its aggressive tactics, and quickly forced through a deal with JD Sports.

58.    This is evident by the fact that, despite its clear interest in the Company, the Board did not offer an opportunity to Sports Direct to submit a bid to purchase Finish Line in an attempt to initiate a bidding war and obtain the best possible price.

59.    Furthermore, the Preliminary Proxy does not disclose the specific powers granted to the Special Committee of the Finish Line Board in regards to approval of any potential strategic alternatives or if its approval was required before a vote on any such potential strategic alternatives was taken up by the full Board.

60.    Additionally, the Preliminary Proxy fails to disclose the nature of the confidentiality and standstill agreements entered into between Finish Line and JD Sports or between Finish Line and Sports Direct throughout the process.  Specifically, the Preliminary Proxy does not reveal if such agreements contained standstill provisions that amounted to "don't-ask, don't-waive" provisions, and, if so, under what specific conditions, if any, such provisions would fall away.

***The Proposed Transaction***

61.    On March 26, 2018, Finish Line issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> **INDIANAPOLIS, March 26, 2018** – Athletic retailer The Finish Line, Inc. (NASDAQ: FINL) announced today that it has entered into a merger agreement providing for JD Sports Fashion Plc (LSE: JD) to acquire 100% of the issued and outstanding Finish Line shares at a price of $13.50 per share in cash representing an aggregate deal value of approximately $558

million. JD is the leading European retailer of sports, fashion and outdoor brands.

"The Special Committee appointed by the Finish Line board recommended and the board voted unanimously to approve entering into this merger agreement," said Bill Carmichael, Chairman of the Special Committee and Lead Director of the Finish Line Board of Directors. "With JD, Finish Line achieves immediate value for its shareholders and moves into a stronger position to compete as part of a global enterprise that leads in our industry."

"Finish Line has long admired JD and their commitment to serve customers with premium brands through a unique and innovative retail experience," said Sam Sato, Chief Executive Officer of Finish Line. "We are thrilled to partner with them and look forward to realizing the impact we will have on the marketplace together."

"We are extremely excited to be joining up with Finish Line, a well-established US operator," said Peter Cowgill, Executive Chairman of JD. "The acquisition represents an excellent opportunity for JD to establish its market leading multi-brand proposition in the world's largest athleisure market. It immediately offers a major presence in the US, a clear next step to further increase our global scale. Finish Line has many similarities to JD with a strong bricks and mortar offering complemented by an advanced and well-invested digital platform. We are looking forward to working with Finish Line's experienced management team to bring best in class retail theatre to the US. Our combined extensive knowledge of the retail market and our product and marketing relationships with global brand partners will benefit our customers, in turn supporting the continued future growth of JD."

Transaction Highlights

- The terms of the merger represent a premium of 28 percent for Finish Line shareholders compared to the closing price of Finish Line's shares of $10.55 as of March 23, 2018.

- This provides an excellent strategic fit for Finish Line and JD. Finish Line moves into a stronger position to compete as part of a global enterprise that leads in the industry. JD gains a significant physical and online retail presence with direct access in the US which they have long identified as a highly attractive growth opportunity.

- Finish Line and JD together create a leading global, premium, multichannel retailer of sports, fashion and outdoor brands who embraces the latest online and in-store digital technology.

- The combined purchasing power of Finish Line and JD, coupled with the strategic alignment with major international sportswear brands in North America, is expected, on completion, to enable the enlarged group to bring a highly differentiated multi-channel retail proposition to the US market.

- Upon closing of the agreement, the Finish Line executive team will continue their involvement with the business.

The merger agreement is subject to Finish Line and JD shareholder approval of the merger, the receipt of all required regulatory approvals, and the satisfaction of other customary conditions to closing. The expected timeline to close on this agreement is no earlier than June 2018.

***The Inadequate Merger Consideration***

62.     Significantly, analyst expectations and the Company's financial prospects and opportunities for future growth, and synergies with JD Sports establish the inadequacy of the merger consideration.

63.     First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company.  The proposed valuation does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into consideration how the Company is performing, considering its significant financial progress in growing the Company within the past year.

64.     Notably, the Company traded at $14.53 per share, higher than the consideration offered in the Merger Consideration, as recently as December 25, 2017.  Notably this amount represents a valuation approximately 7.63% higher than that contained in the Proposed Transaction.  Moreover, the Company has traded as high as $16.38 per share within the past 52-week period, ***a value more than 21.33% higher than that contained in the Proposed Transaction.***

65.     In addition, recent financial analyst coverage that indicates a high target above the deal price, with financial analysts from Morgan Stanley valuing the Company at $18.00 per share

as recently as August 2017. ***Notably, this amount reflects a value approximately 25.00% above the value being proffered in the Proposed Transaction.***

66.     Additionally, Finish Line's future success is extremely likely, given the consistent financial achievements.

67.     Obviously, the opportunity to invest in such a company on the rise is a great coup for JD Sports, however it undercuts the foresight and investment of Plaintiff and all other public stockholders who have done the same.

68.     Finally, the Proposed Transaction represents a significant synergistic benefit to JD Sports, which operates in the same industry as Finish Line, and who will immediately have an open door to the US sector of the industry.  Specifically, as noted in the press release announcing the Proposed Transaction, the synergies derive through the Proposed Transaction are highly significant, stating, "This provides an excellent strategic fit for Finish Line and JD.  Finish Line moves into a stronger position to compete as part of a global enterprise that leads in the industry.  JD gains a significant physical and online retail presence with direct access in the US which they have long identified as a highly attractive growth opportunity."

69.     Moreover, those in the financial media have noted the substantial and immediate benefits JD Sports will receive as a result of the consummation of the Proposed Transaction.  For Example, as quoted in a March 26, 2018, *Investor's Business Daily*, Baird Equity Research senior analyst Jonathan Komp stated, "Having JD operate the Finish Line stores could strengthen the overall operating performance, thus providing incremental full-priced selling opportunities for the brands especially if JD were to accelerate U.S. store openings of its own banner and the remodeling of FINL stores."

70.    Clearly, while the deal will be beneficial to JD Sports it comes at great expense to Plaintiff and other public stockholders of the Company, who will be frozen out from any potential future returns on their investment.

71.    It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for JD Sports at the expense of Finish Line and Finish Line stockholders, which clearly indicates that Finish Line stockholders were not an overriding concern in the formation of the Proposed Transaction.

**Preclusive Deal Mechanisms**

72.    The Merger Agreement contains certain provisions that unduly benefit JD Sports by making an alternative transaction either prohibitively expensive or otherwise impossible. Significantly, the Merger Agreement contains a termination fee provision that requires Finish Line to pay up to $28 million to JD Sports if the Merger Agreement is terminated under certain circumstances.  Moreover, under one circumstance, Finish Line must pay this termination fee even if it consummates any Alternative Transaction Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  The termination fee will make the Company that much more expensive to acquire for potential purchasers.  The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

73.    The Merger Agreement also contains a "No Solicitation" provision that restricts Finish Line from considering alternative acquisition proposals by, *inter alia*, constraining Finish Line's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited

bona fide *"Alternative Transaction Proposal"* if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

74.    Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, the Individual Defendants agreed to provide to JD Sports information in order to match any other offer, thus providing JD Sports access to the unsolicited bidder's financial information and giving JD Sports the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of JD Sports'.

75.    These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

76.    Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

***Potential Conflicts of Interest***

77.    Finish Line insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Finish Line.

78.    Certain insiders stand to receive massive financial benefits as a result of the Proposed Transaction.  For example, many Company insiders likely hold large, illiquid blocks of Finish Line common stock, which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction.  These large blocks of stock will allow Company insiders to immediately receive massive cash payouts upon the consummation of the Proposed

Transaction, in many cases in the millions of dollars. Ownership of large blocks of Company stock amongst Company insiders is as follows:

| Name and Position | Number of Shares[1] | Stock Options Exercisable within 60 days[2] | Total Shares Beneficially Owned | % of Shares[3] |
|---|---|---|---|---|
| Samuel M. Sato<br>*Chief Executive Officer and Director* | 342,441[4] | 370,563 | 713,004 | 1.7% |
| Edward W. Wilhelm<br>*Executive Vice President,*<br>*Chief Financial Officer* | 87,452[5] | 191,296 | 278,748 | * |
| John J. Hall<br>*Executive Vice President, Division President,*<br>*Chief Merchandising Officer* | 82,390[6] | 156,404 | 238,794 | * |
| Melissa A. Greenwell<br>*Executive Vice President, Chief Operating Officer* | 65,461[7] | 136,545 | 202,006 | * |
| Albert J. Sutera<br>*Executive Vice President,*<br>*Chief Information Technology Officer* | 42,210[8] | 12,724 | 54,934 | * |
| Glenn S. Lyon<br>*Chairman of the Board* | 49,543[9] | 873,979 | 923,522 | 2.1% |
| Torrence Boone<br>*Director* | 28,533[9] | — | 28,533 | * |
| William P. Carmichael<br>*Director* | 57,094[9] | — | 57,094 | * |
| Richard P. Crystal<br>*Director* | 38,987[9] | — | 38,987 | * |
| Stephen Goldsmith<br>*Director* | 52,208[9] | — | 52,208* | |
| Catherine A. Langham<br>*Director* | 37,788[9] | — | 37,788* | |
| Faisal Masud<br>*Director* | 7,447[10] | — | 7,447* | |
| All current executive officers and directors as a group<br>(12 persons) | 891,554 | 1,741,511 | 2,633,065 | 6.1% |

79.    Additionally, upon the consummation of the Proposed Transaction, each outstanding Company restricted stock awards will be canceled and converted into the right to receive the merger consideration. Notably, Company insiders, including certain Individual Defendants, will receive millions of dollars in consideration upon the consummation of the Proposed Transaction due to the cashing out of their equity awards as follows:

| Name | # of Shares of Company Restricted Stock | Value of Company Restricted Stock |
|---|---|---|
| *Directors* | | |
| Torrence Boone | 7,025 | $ 94,838 |
| William P. Carmichael | 7,025 | $ 94,838 |

| | | | |
|---|---:|---|---:|
| Richard P. Crystal | 7,025 | $ | 94,838 |
| Stephen Goldsmith | 7,025 | $ | 94,838 |
| Catherine A. Langham | 7,025 | $ | 94,838 |
| Glenn S. Lyon | 7,025 | $ | 94,838 |
| Faisal Masud | 7,447 | $ | 100,535 |
| *Executive Officers* | | | |
| Melissa Greenwell | 40,744 | $ | 550,044 |
| John Hall | 60,919 | $ | 822,407 |
| Samuel M. Sato | 254,572 | $ | 3,436,722 |
| AJ Sutera | 38,480 | $ | 519,480 |
| Edward W. Wilhelm | 47,988 | $ | 647,838 |

80.    Given the above, it is clear that each and every director of the Company stands to receive massive paydays, and as such, are clearly interested in the Proposed Transaction at issue.

81.    Moreover, employment agreements with certain Finish Line executives, including certain directors, grant severance packages should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant, and will grant each director or officer entitled to them millions of dollars, compensation not shared by Finish Line's common stockholders.

82.    The following table sets forth the Golden Parachute compensation for certain Finish Line's directors and officers, as well as their estimated value payable:

| NEO | Lump Sum Cash Payment (Base + Target Bonus x 2.5)[1] | | Health Insurance Benefits for Two Years[2] | | Tax Gross Up[3] |
|---|---:|---|---:|---|---:|
| Samuel M. Sato | $ | 5,775,000[4] | $ | 32,404 | — |
| Melissa A. Greenwell | $ | 1,968,750[5] | $ | 23,789 | — |
| Edward W. Wilhelm | $ | 2,318,750[6] | $ | 32,404 | — |
| John J. Hall | $ | 2,778,125[7] | $ | 32,404 | — |
| AJ Sutera | $ | 2,859,375[8] | $ | 32,404 | — |

83.    Further, the Preliminary Proxy indicates that JD Sports plans to commence an integration planning process to determine the continuing employment status of several members of Finish Line management. As such, several Company insiders are likely to retain lucrative

24

employment positions in the surviving company, benefits not shared amongst Plaintiff and other members of the Class.

84.    Finally the Preliminary Proxy indicates that all of the Directors and executive officers of Finish Line have entered into voting and support agreements guaranteeing that all Company stock they own will be voted in favor of the Proposed Transaction, thus making any third party bid less likely to succeed.

85.    It is no wonder that, in light of the extremely lucrative profits for themselves, the Board allowed the Company to be sold far under its proper value in order to secure a quick sale.

86.    Thus, while the Proposed Transaction is not in the best interests of Finish Line stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Preliminary Proxy***

87.    On April 24, 2018, the Defendants caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

88.    Specifically, the Preliminary Proxy fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Preliminary Proxy fails to disclose:

    a.  The Board's decision to not engage in a market check for other potentially interested third parties;

b.  The basis Sports Direct was not given an opportunity to bid on the Company to initiate a bidding war with JD Sports;

c.  The specific powers of the Special Committee of the Board in relation to the approval or disapproval of any potential strategic alternative that may have arisen during the sales process;

d.  The effect, if any, the continued hostile actions taken by Sports Direct, had on the sales process;

e.  The specific nature of the standstill provisions included in the confidentiality agreements entered into between Finish Line and JD Sports and/or Finish Line and Sports Direct (if any were executed), including whether the disclosed standstill provisions contained "don't-ask, don't-waive" clauses, and under what conditions, if any, such clauses would fall away;

f.  Specific information regarding which, if any, of the Individual Defendants or Finish Line executives will receive post-closure employment from JD Sports, or the criteria that will be used to determine such employment; and

g.  The specific reasoning for the retention of both PJ SOLOMON and Houlihan Lokey as financial advisors rather than the retention of a single financial advisor.

_Omissions and/or Material Misrepresentations Concerning Finish Line's Financial Projections_

89.  The Preliminary Proxy fails to provide material information concerning financial projections provided by Finish Line's management and relied upon by PJ SOLMON and Houlihan Lokey in their analyses.   The Preliminary Proxy discloses management-prepared financial

projections for the Company which are materially misleading.  The Preliminary Proxy indicates that in connection with the rendering of PJ SOLOMON's fairness opinion, PJ SOLOMON "reviewed certain financial projections for Finish Line prepared and provided to PJ SOLOMON by the management of Finish Line".  The Preliminary Proxy also indicates that in connection with the rendering of Houlihan Lokey's fairness opinion, Houlihan Lokey, "reviewed certain information relating to the historical, current and future operations, financial condition and prospects of Finish Line made available to Houlihan Lokey by Finish Line, including financial projections prepared by the management of Finish Line relating to Finish Line for the fiscal years ending 2018 through 2021".  Accordingly, the Preliminary Proxy should have, but fails to provide, certain information in the projections that Finish Line's management provided to the Board, the Special Committee, PJ SOLOMON, and Houlihan Lokey.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

90.    The Preliminary Proxy fails to provide material information concerning the financial projections prepared by the Company's management.

91.    The Preliminary Proxy fails to provide material information concerning the financial projections prepared by Finish Line management.  Specifically, the Preliminary Proxy fails to disclose the material line items for the following metrics:

    a.  The line items used to calculate EBITDA, including:

        i.  Net Profit;

        ii.  Interest;

       iii.  Taxes;

       iv.  Depreciation and Amortization.

    b.  The line items used to calculate EBIT, including:

       i.  Net Profit;

       ii.  Interest; and

       iii.  Taxes

    c.  Unlevered free cash flows

92. Moreover, the Preliminary Proxy provides projections for certain non-GAAP (Generally Accepted Accounting Principles) financial measures, such as EBITDA and EBIT. Despite disclosing that such figures are non-GAAP measures, the Preliminary Proxy fails to disclose net profit, the most directly comparable measure calculated in accordance with GAAP.

93. This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

94. Without accurate projection data presented in the Preliminary Proxy, Plaintiff and other stockholders of Finish Line are unable to properly evaluate the Company's true worth, the accuracy of PJ SOLOMON or Houlihan Lokey's financial analyses, or make an informed decision whether to vote their Company stock in the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by PJ SOLOMON*

95. In the Preliminary Proxy, PJ SOLOMON describes its respective fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions

fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

96.    With respect to the *Analysis of Selected Publicly Traded Companies,* the Preliminary Proxy fails to disclose:

      a.  The specific enterprise value and equity value for each of the compared companies;

      b.  The actual multiples selected and applied in the analysis; and

      c.  Whether PJ SOLOMON performed any type of benchmarking analysis for the Company in relation to each of the selected companies analyzed.

97.    With respect to the *Analysis of Selected Precedent Transactions*, the Preliminary Proxy fails to disclose:

      a.  The objective selection criteria for each of the selected transactions;

      b.  The actual multiples selected and applied in the analysis; and

      c.  The specific transaction value for the transactions analyzed.

98.    With respect to the *Illustrative Discounted Cash Flow Analysis,* the Preliminary Proxy fails to disclose:

      a.  the specific inputs and assumptions used to determine the discount rate range of 11.0% to 13.0% as applied to Finish Line;

      b.  the specific inputs and assumptions used to determine the terminal values multiples from 3.5x to 5.5x, as applied to Finish Line's estimated EBITDA for the fiscal year ending February 28, 20121; and

    c.   The estimated weighted average cost of Capital of Finish Line used in the analysis.

99.    These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

100.    Without the omitted information identified above, Finish Line's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests. Moreover, without the key financial information and related disclosures, Finish Line's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Houlihan Lokey*

101.    In the Preliminary Proxy, Houlihan Lokey describes its respective fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

102.    With respect to the *Selected Public Companies Analysis,* the Preliminary Proxy fails to disclose:

    a.   The objective selection criteria values for each of the selected companies;

    b.   The specific enterprise value and equity value for each of the compared companies and Finish Line on a standalone basis; and

c.   Whether Houlihan Lokey performed any type of benchmarking analysis for the Company in relation to each of the selected companies analyzed.

103.   With respect to the *Illustrative Discounted Cash Flow Analysis,* the Preliminary Proxy fails to disclose:

a.   the specific inputs and assumptions used to determine the discount rate range of 10.0% to 12.0% as applied to Finish Line;

b.   the specific inputs and assumptions used to determine the terminal values multiples from 3.5x to 5.5x, as applied to Finish Line's estimated EBITDA for the fiscal year ending February 28, 20121; and

c.   The estimated weighted average cost of Capital of Finish Line used in the analysis.

104.   With respect to the *Analysis of Selected Precedent Transactions*, the Preliminary Proxy fails to disclose why Houlihan Lokey could not perform a precedent transaction analysis but PJ SOLOMON was able to and what discussions occurred regarding same.

105.   These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.  Without the omitted information identified above, Finish Line's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Finish Line's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.

**FIRST COUNT**

**Claim for Breach of Fiduciary Duties**

**(Against the Individual Defendants)**

106.    Plaintiff repeats all previous allegations as if set forth in full herein.

107.    The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

108.    By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Finish Line.

109.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of Finish Line by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of Finish Line to its public stockholders.

110.    Indeed, Defendants have accepted an offer to sell Finish Line at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

111.    Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed vote on whether to approve the Merger.

112.    The Individual Defendants dominate and control the business and corporate affairs of Finish Line, and are in possession of private corporate information concerning Finish Line's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Finish Line which makes it

inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

113.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

114.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Finish Line's assets and have been and will be prevented from obtaining a fair price for their common stock.

115.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

116.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**SECOND COUNT**

**Derivative Claim for Breach of Fiduciary Duties**

**<u>(Against the Individual Defendants)</u>**

117.    Plaintiff repeats all previous allegations as if set forth in full herein.

118.    The Individual Defendants have violated fiduciary duties owed to the Company and have placed their own personal interests ahead of those of the Company.

119.    The Individual Defendants knowingly or recklessly and in bad faith violated their fiduciary duties by entering into the Proposed Transaction without regard to the fairness of the transaction to the Company.

120.    As alleged herein, the Individual Defendants have initiated a process to sell Finish Line that undervalues the inherent, standalone value of the Company. In addition, by agreeing to the Proposed Transaction, the Individual Defendants have capped the price of Finish Line stock at a price that does not adequately reflect the Company's true inherent, standalone value. Furthermore, any alternate acquirer will be faced with engaging in discussions with a management team and Board that is committed to the Proposed Transaction and face insurmountable deal protection devices.

121.    The Individual Defendants are engaging in self-dealing, are not acting in good faith, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties to the Company.

122.    As a result of the actions of Defendants, the Company will suffer irreparable injury. Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to the Company, all to the irreparable harm of the Company.

123.    The Company has no adequate remedy at law. Only through the exercise of this Court's equitable powers can the Company be fully protected from immediate and irreparable injury, which the Individual Defendants' actions threaten to inflict.

## THIRD COUNT

## Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

124.    Plaintiff repeats all previous allegations as if set forth in full herein.

125.    Defendants have disseminated the Preliminary Proxy with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

126.    Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

127.    As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

128.    The Preliminary Proxy was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that

35

the Preliminary Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

129.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

130.    The Individual Defendants were at least negligent in filing a Preliminary Proxy that was materially misleading and/or omitted material facts necessary to make the Preliminary Proxy not misleading.

131.    The misrepresentations and omissions in the Preliminary Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of its entitlement to decide whether to vote its shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## FOURTH COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

132.    Plaintiff repeats all previous allegations as if set forth in full herein.

133.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Preliminary Proxy was materially misleading to Company stockholders.

134.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Preliminary Proxy and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Preliminary Proxy before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

135.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Finish Line's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Preliminary Proxy was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy and are therefore responsible and liable for the misrepresentations contained herein.

136.    The Individual Defendants acted as controlling persons of Finish Line within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Finish Line to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Finish Line and all of its employees.  As alleged above, Finish Line is a primary violator of Section 14 of the Exchange Act

and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class, and against the Defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives for the Class Counts of the Complaint and Plaintiff's counsel as Class counsel;

B.    Declaring that this action is properly maintainable as a derivative action and declaring Plaintiff as an adequate representative of the Company for the derivative counts;

C.    Enjoining the Proposed Transaction;

D.    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

E.    Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

F.    Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Finish Line and obtain a transaction which is in the best interests of Finish Line and its stockholders;

G.    Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

H.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

I.    Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: May 2, 2018                      **RILEY WILLIAMS & PIATT, LLC**

                              By: _/s/ *William N. Riley*_____
                                  William N. Riley
                                  Hammond Block Building
                                  301 Massachusetts Avenue, Suite 300
                                  Indianapolis, Indiana 46204
                                  Tel.:    (317) 633-5270
                                  Fax:    (317) 426-3348
                                  wriley@rwp-law.com

**OF COUNSEL**

Evan J. Smith, Esquire
Marc L. Ackerman, Esquire
**BRODSKY & SMITH, LLC**
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
Phone: (610) 667-6200
Facsimile: (610) 667-9029
esmith@brodskysmith.com
mackerman@brodskysmith.com

*Attorneys for Plaintiff*